[Cite as *State v. Johnson*, 2019-Ohio-1089.]

# IN THE COURT OF APPEALS OF OHIO

### SEVENTH APPELLATE DISTRICT
### MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MELVIN E. JOHNSON, JR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 MA 0050**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 13 CR 380(D)

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee

*Atty. Donald R. Hicks*, 159 S. Main Street, #423, Akron, Ohio 44308, for Defendant-Appellant.

Dated: March 19, 2019

---

**WAITE, P.J.**

**{¶1}** Appellant Melvin E. Johnson, Jr. appeals a March 22, 2017 judgment entry convicting him of various crimes associated with a drug distribution organization. Appellant argues that the trial court's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. Appellant also argues that the trial court erroneously admitted evidence of text messages in violation of the Confrontation Clause. Appellant additionally challenges the sufficiency of his indictment. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

*The Organization*

**{¶2}** This case involves crimes related to a million dollar drug distribution organization led by Vincent Moorer and DeWaylyn "Waylo" Colvin. Originally, two separate drug distribution organizations existed: a group led by Colvin that sold heroin and a group led by Moorer that sold crack cocaine. At some point, the two groups merged and formed one heroin distribution organization. Colvin and Moorer were jointly in charge of the organization. Appellant was known as a "triggerman" within the organization. A triggerman is responsible for the deaths of anyone who did not pay money owed to the organization or harmed or offended someone in the organization.

*Indictments*

**{¶3}** This matter arose from an April 11, 2013 indictment charging Colvin, Michael Austin, and Hakeem Henderson with various drug offenses. On May 16, 2013, a superseding indictment was filed against Colvin, Austin, and Henderson. On May 21, 2015, a second superseding indictment was filed and added Moorer, Appellant, and

Nahdia Baker as defendants. Baker is also a member of the organization. Appellant was charged in thirteen of the counts.

{¶4} Appellant was charged with: four counts of attempted murder, felonies of the first degree in violation of R.C. 2903.02(A), (D) and R.C. 2923.02(A); four counts of felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2), (D); two counts of having a weapon while under a disability, a felony of the third degree in violation of R.C. 2923.14; two counts of improperly discharging a weapon at or into a habitation, a felony of the second degree in violation of R.C. 2923.161(A)(1), (C); and engaging in a pattern of corrupt activity, a felony of the first degree in violation of R.C. 2923.32(A)(1), (B). The only charges relevant to this appeal are the attempted murder and felonious assault of J.M. and engaging in a pattern of corrupt activity.

*J.M. Incident*

{¶5} On March 20, 2014, J.M. was shot near the intersection of South Avenue and Mathews Road. According to M.P., a member of the organization, J.M. was targeted because Moorer believed that he had set up Dashonti Baker to be robbed. Baker is also a member of the organization. Moorer obtained a phone belonging to Dashonti Baker and used it to text J.M. to set up a fake drug deal and lure him to the South Avenue/Mathews Road location.

{¶6} Moorer drove a rented sports utility vehicle ("SUV") to the South Avenue/Mathews Road location. M.P. sat in the front passenger seat and Appellant sat in the backseat. Once the SUV arrived at the targeted location, Appellant exited the SUV with a gun on his person. Moorer drove into the parking lot of a nearby car wash and

waited. Appellant approached J.M. and fired approximately four shots at J.M. who fell to the ground. Appellant ran back to the SUV which drove away after picking up Appellant.

{¶7} J.M. made his way to the intersection of Cook and Evans Avenues before police officers located him. According to Officer Joseph O'Grady, J.M. had been shot three times. Det. Glenn Patton testified that he was able to secure J.M.'s phone at the scene and retrieved the text message conversation with Baker's phone using a tool called "Cellbrite."

*Trial*

{¶8} Appellant and his codefendant Moorer were tried in a bench trial commencing on March 2, 2017. The remaining defendants were tried in two separate trials. Henderson's convictions were affirmed in *State v. Henderson*, 7th Dist. No. 16 MA 57, 2018-Ohio-5124. The appeals of Moorer, Austin, and Baker remain pending at this Court. Colvin did not appeal his convictions which were the result of a plea agreement. Colvin, Austin, Henderson, and Baker are not relevant to this appeal.

{¶9} Appellant was convicted of: attempted murder of J.M. and the attendant firearm specification; felonious assault of J.M. and the attendant firearm specification; having a weapon while under a disability; and engaging in a pattern of corrupt activity. The court found Appellant not guilty of: aggravated arson, arson, two counts of improperly discharging a firearm at or into a habitation; three counts of attempted murder; three counts of felonious assault; and having a weapon while under a disability.

*Sentencing*

{¶10} We note that Appellant had earlier been convicted on other charges relative to his drug operations in the federal system. According to PACER, Appellant received an

aggregate sentence of 140 months, approximately eleven and one-half years, of incarceration. In this matter, the trial court sentenced Appellant to eleven years of incarceration for the attempted murder of J.M. with three years for the attendant firearm specification, three years for having weapons while under disability conviction, and eleven years of incarceration for the engaging in a pattern of corrupt activity charge. The attempted murder and felonious assault convictions merged for purposes of sentencing and the state elected to proceed on the attempted murder conviction. Appellant's firearm specification was ordered to be served prior to and consecutively to the underlying offense. The trial court ordered the remaining sentences to run consecutively to one another and consecutive to Appellant's sentence in his federal case. Appellant timely appealed his convictions.

ASSIGNMENTS OF ERROR NOS. 1 AND 2

THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE CONVICTIONS.

THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶11}** Appellant argues that his convictions for the attempted murder and felonious assault of J.M. are not supported by sufficient evidence and are against the manifest weight of the evidence. Appellant argues that only three of the thirty-seven witnesses who testified in this case implicated him. He highlights the fact that none of the text messages, physical evidence, or DNA evidence in this case implicated him. Furthermore, he contends that the state's star witness, M.P., lacked credibility because

he did not come forward until he was given a plea agreement by the state. Appellant urges that the record is devoid of any evidence to corroborate M.P.'s testimony.

**{¶12}** In response, the state highlights the testimony of M.P. who saw Appellant exit the SUV with a gun. He heard gunshots and then saw Appellant run back into the SUV. Appellant confessed his action to M.P. and Moorer.

**{¶13}** Appellant was convicted of the attempted murder and felonious assault of J.M. Attempted murder involves conduct that, if successful, would result in purposely causing the death of another. R.C. 2903.02(A); R.C. 2923.02(A). R.C. 2903.11(A), the felonious assault statute, states that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶14}** "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶15}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶16}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶17}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461

N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶18}** M.P. testified that Moorer ordered a retaliatory hit after J.M. allegedly set up Dashonti Baker to be robbed. According to M.P., Moorer used Baker's phone to text and lure J.M. to the South Avenue location on the premise of a drug deal. Moorer texted J.M. to learn his location and directed him to a specific intersection, South Avenue and Mathews Road. According to M.P., Moorer drove a rented SUV. M.P. sat in the front seat passenger and Appellant sat in the backseat. Appellant exited the SUV near where J.M. was waiting, supposedly for Baker. According to M.P., Appellant had a gun as he exited the vehicle. Moorer then drove to a nearby car wash and parked the vehicle. Video from the car wash's surveillance system confirmed that a SUV matching the description M.P. provided waited in the parking lot for a few minutes and then drove away. M.P. testified that he heard gunshots and then saw J.M. fall in the street. Appellant then ran towards the SUV, which picked him up and drove from the scene. Once inside the vehicle, Appellant told M.P. and Moorer that J.M. had asked him for a cigarette, which gave him an opportunity to pull out his gun and shoot him. The text messages between J.M. and Moorer and the car wash surveillance video were admitted into evidence and largely corroborated M.P.'s testimony.

{¶19} While Appellant questions the credibility of M.P., who admittedly was part of the organization and received a plea deal, M.P.'s testimony about Appellant's involvement is largely corroborated.  An eyewitness who lived near the car wash testified that she heard gunshots and looked out her window and she saw two men near the car wash.  She went to her front porch and saw a SUV pull out of the car wash and pick up one of the men before driving down the street.  The car wash surveillance video shows a SUV matching the description provided by M.P. pull into the parking lot, park for a few minutes, and then exited.  M.P.'s testimony is also corroborated by text messages.  Text messages allegedly sent by Appellant to J.M. show that Appellant lured J.M. to the South Avenue location on the premise of making a drug deal.

{¶20} Based on these facts, the state presented sufficient evidence to demonstrate that Appellant's actions were purposeful and were designed to cause the death of J.M.  Thus, Appellant's conviction for the attempted murder of J.M. is supported by sufficient evidence and is not against the manifest weight of the evidence.  For the same reasons, Appellant's conduct caused physical harm, gunshot wounds, to another by use of a deadly weapon, a gun.  Thus, his felonious assault conviction is also supported by sufficient evidence and is not against the manifest weight of the evidence.

{¶21} Accordingly, Appellant's first and second assignments of error are without merit and are overruled.

## ASSIGNMENT OF ERROR NO. 3

THE ADMISSION OF UNAUTHENTICATED CELL PHONE TEXT MESSAGES VIOLATES THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Case No. 17 MA 0050

{¶22} Appellant contends that the trial court erroneously admitted text messages from the phone of J.M. into evidence. Appellant asserts that the text messages are testimonial in nature. As J.M., the recipient of the messages did not testify, Appellant argues that the trial court's decision to admit the messages violates the Confrontation Clause. Even if this Court were to find that the text messages are nontestimonial, Appellant argues that they were not properly authenticated.

{¶23} The state responds by arguing that the text messages are nontestimonial and were properly authenticated through the testimony of Det. Glenn Patton and M.P. As such, the state contends that the trial court's decision did not violate the Confrontation Clause.

{¶24} We note that the state presented the text messages as evidence that Moorer lured J.M. to the South Avenue location using Baker's phone. Even though the messages do not implicate Appellant, he believes that they bolstered the testimony of M.P., who implicated him as the shooter.

{¶25} The Confrontation Clause affords a criminal defendant the right "to be confronted with the witnesses against him." U.S. Constitution, Sixth Amendment. Pursuant to the United States Supreme Court, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The prominent issue is "what constitutes a testimonial statement: 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation

Clause.' " *State v. Shaw,* 2013-Ohio-5292, 4 N.E.3d 406 ¶ 39 (7th Dist.), citing *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).

**{¶26}** Det. Patton testified that J.M.'s phone was found on or near his person when officers located him. Det. Patton used a program called "Cellbrite" to read and extract the text messages. Initially, Det. Patton was not able to determine the owner of the phone that sent the text messages because it was a "TracFone." However, the Cellbrite program revealed the phone number of the TracFone.

**{¶27}** Det. Patton located a text message in J.M.'s phone where he asked someone for "Sweat's" phone number. Sweat is Dashonti Baker's nickname. The recipient of the text message responded "(330)942-5193," which is the number associated with the TracFone that had communicated with J.M. prior to the shooting. (Trial Tr. Vol. III, pp. 625, 633.) Thus, Det. Patton was able to connect Baker's phone to the text messages. The following text messages detail the conversation between Baker's phone and J.M. during the time period leading up the shooting.

[J.M.] Yo wut up

[Baker] Im b ready n lik 20

[J.M.] Kool

[Baker] Where u at Im n traffic

[J.M.] I'm like in boardman by sparkles

[Baker] N dem partments? Im klose

[J.M.] Yea but up more on. Afton and cook

[Baker] 5min

[J.M.] Ok

[J.M.]  Yo

[Baker]  My bad  Im n route had 2 make kouple moves

[J.M.]  Ight 4sho

[J.M.]  Bout how J.L. fam

[J.M.]  Dats kool u comen 4sho I can try 2 come down south ave but I'm walkn

[J.M.]  ??

[Baker]  Koo wat side you walkin 0n im bouta pass jqs

[J.M.]  Left or right wut side should i [sic]

(Exh. 570.)

{¶28} We have acknowledged that "photographs of the text messages can be admissible as an admission by a party-opponent under Evid.R. 801(D)(2)(a) if they are properly authenticated." *Shaw* at ¶ 43. The first part of the rule requires the text message to be an admission of a party opponent.  Pursuant to Evid.R. 801(D)(2), an admission by a party opponent is a

> [S]tatement [that] is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity, or (b) a statement of which the party has manifested an adoption or belief in its truth, or (c) a statement by a person authorized by the party to make a statement concerning the subject, or (d) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (e) a statement by a co-

Case No. 17 MA 0050

conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.

**{¶29}** The issue, here, is whether text messages sent from Appellant while using Baker's phone constitutes a party opponent admission. The existing caselaw addresses only whether a text message sent from a defendant's phone constitutes a party admission.

**{¶30}** Although not directly on point, a case arising from the Eighth District provides guidance. See *State v. Roseberry*, 197 Ohio App. 256, 2011-Ohio-5921, 967 N.E.3d 233 (8th Dist.). In *Roseberry*, the victim wrote out text messages she sent to and received from the defendant by hand. The texts were later accidently deleted from the phone. The handwritten text messages were a verbatim recitation of the messages but did not indicate who sent and who received each message. Two groups of text messages were admitted at trial. The victim read the first group of messages and indicated who sent and received each message. A detective without personal knowledge of who sent and received the message testified as to the second group of messages.

**{¶31}** On appeal, the Eighth District held that the text messages to which the victim provided testimony regarding the contents, sender, and recipient were admissible pursuant to Evid.R. 801(D)(2). However, because the detective did not know the defendant's phone number or who sent and received the text messages, the text messages from the second group were inadmissible hearsay. The Eighth District focused its analysis on whether the person testifying about the text messages had personal knowledge of the contents and could identify the sender and recipient of the messages. *Id.* at ¶ 75.

**{¶32}** Although *Rosebery* is distinguishable from the instant matter as the texts in that case were sent by the defendant from his own phone, the reasoning in that case provides guidance. The *Roseberry* court focused on the fact that the witness had personal knowledge of the content of the messages and was able to convey who sent and received each text message. In the instant matter, Det. Patton, who had personal knowledge of the number associated with the TracFone, testified as to the senders and recipients of the text messages. The Cellbrite copy of the text messages revealed the phone number associated with the text messages and who sent and received each message. Further, M.P. testified that he was present when Moorer texted J.M. with Baker's phone. (Tr. Vol. III, pp. 491-492.) According to M.P., Moorer read the contents of the text message exchange as it was happening between M.P. and Appellant. (Trial Tr. Vol. III, p. 491.)

**{¶33}** The sole reason the second group of text messages were deemed inadmissible in *Roseberry* was due to the fact that the text messages were handwritten and the detective testifying as to their content did not have independent knowledge of the identity of the sender and recipient of the text messages. Here, Det. Patton's testimony and the Cellbrite printout demonstrated the recipient and sender's phone numbers. M.P. also testified as to who sent and received the messages and additionally provided testimony as to the content of the messages. The trial court correctly points out that this particular issue presents an issue of credibility rather than admissibility. Regardless, the state presented sufficient evidence that Moorer sent the text messages.

**{¶34}** Next, it must be shown that the text messages were authenticated. Appellant cites to *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057.

In *Hood*, the Ohio Supreme Court held that phone records between conspirators were inadmissible because those records were not authenticated pursuant to Evid.R. 803(6). *Id.* at ¶ 41. However, this case is distinguishable from *Hood*. Here, the state provided a printout of the text messages using the "Cellbrite" tool which extracted the content of the text messages and displayed the phone number for both the sender and recipient. Cellbrite allows investigators to extract information, such as text messages, from a phone without having to request the phone records from the provider. (Trial Tr. Vol. III, p. 611.) Because the text messages were taken directly from the phone itself during the criminal investigation without subpoenaing the records from the provider, the authentication requirements of Evid.R. 803(6), do not apply, here. See *State v. Norris*, 2016-Ohio-5729, 76 N.E.3d 405 (2d Dist.).

{¶35} "[T]he threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.' " *State v. Inkton,* 2016-Ohio-693, 60 N.E.3d 616, ¶ 73 (8th Dist.), quoting *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). Authenticity may be established through circumstantial evidence. *Id.* Pursuant to Evid.R. 901(B)(1), the authentication requirement can be satisfied by the "[t]estimony of a witness with knowledge. Testimony that a matter is what it is claimed to be." Here, the text messages were authenticated by M.P. As previously discussed, he testified that he was inside the SUV with Moorer when the text messages were sent and that Moorer read the contents of the texts to Appellant and M.P. as he wrote and received them. As such, M.P. had personal knowledge of the contents of the text messages.

Case No. 17 MA 0050

**{¶36}** As to M.P.'s credibility, a surveillance video from the car wash confirms that a SUV matching the description given by M.P. pulled into the parking lot around the time of the shooting and left shortly thereafter. Further, a witness who lived nearby testified that she heard several gun shots and looked out of her window and saw two men near the car wash. She went outside and from her front porch saw a SUV pull out of the car wash and pick up one of the men before speeding down the street. M.P.'s description of the SUV is consistent with both the surveillance video and the witness' description. Thus, M.P.'s testimony is largely corroborated by other evidence.

**{¶37}** Even if the text messages were improperly admitted, any error would be harmless. The testimony of M.P. provided the basis for Appellant's conviction. M.P. testified that he saw Appellant with a gun as he exited the SUV and approached J.M. He then heard gunshots, saw J.M. fall to the ground, and then saw Appellant run back to the SUV. Once inside the SUV, Appellant told M.P. and Moorer that J.M. asked him for a cigarette which gave him an opportunity to reach for his gun and shoot him. After picking up Appellant, the SUV drove away. As previously discussed, M.P.'s testimony is largely corroborated by other evidence. Thus, there is sufficient evidence to support Appellant's conviction even without the text messages. See *State v. Williams,* 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983) ("Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt.") Accordingly, Appellant's third assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 4

Case No. 17 MA 0050

UNSPECIFIED "OTHER DRUG OFFENSES" CANNOT SERVE AS PREDICATE OFFENSE FOR A CONVICTION OF ENGAGING IN A PATTERN OF CORRUPT ACTIVITY UNLESS SUCH PRIOR CONVICTION WAS EXPRESSLY ALLEGED IN THE INDICTMENT.

**{¶38}** Appellant argues that the indictment did not adequately place him on notice of the federal charges the state used as predicate acts to establish that he was engaging in a pattern of corrupt activity as charged. Appellant notes that the indictment stated: "and/or other drug offenses (Possession and/or Trafficking; State and/or Federal.)" Appellant urges that this information is insufficient without reference to a specific offense. Appellant acknowledges that he is limited to a plain-error analysis as he failed to object at trial.

**{¶39}** In response, the state argues that Appellant was sufficiently placed on notice of the predicate offense through the indictment and the bill of particulars pursuant to *State v. Roberson,* 3d Dist. No. 5-02-45, 2003-Ohio-4627.

**{¶40}** Because the adequacy of an indictment is a question of law, a reviewing court reviews such arguments *de novo. State v. Mason*, 3d Dist. No. 9-16-34, 2016-Ohio-8400, ¶ 17, citing *State v. Hernon*, 9th Dist. No. 2933–M, 2000 WL 14009, *2 (Dec. 29, 1999). However, in this matter, Appellant did not object to the indictment or bill of particulars, thus he is limited to plain-error review. "A failure to raise a defense or objection identifying a defect in the indictment prior to trial 'shall constitute waiver of the defenses or objections.' " *State v. Billman,* 7th Dist. Nos. 12 MO 3, 12 MO 5, 2013-Ohio-5774, ¶ 23, citing Crim.R. 12(H). When an appellant fails to timely raise this objection in the trial court, a reviewing court is limited to determining whether the information in the

indictment is so deficient as to constitute plain error. *Id.* at ¶ 24, citing *State v. Horner*, 126 Ohio St.3d 466, 473, 2010-Ohio-3830, paragraph three of the syllabus; *State v. Frazier*, 73 Ohio St.3d 323, 332, 652 N.E.2d 1000 (1995); *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215.

**{¶41}** Pursuant to R.C. 2923.31(E), " 'Pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

**{¶42}** The indictment provided the following predicate offenses related to Appellant: "Attempted Murder (F-1) (Counts 15, 22, 24, and/or 26 of this Indictment); Felonious Assault (F-2) (Counts 16, 23, 25, and/or 27 of this Indictment); Aggravated Arson (F-2) (Count 18 of this Indictment); Arson (F-4) (Count 19 of this Indictment); Improperly Discharging Firearm at or into Habitation (F-2) (Counts 20 and/or 21 of this Indictment)." The indictment also states: "and/or other drug offenses (Possession and/or Trafficking; State and/or Federal)."

**{¶43}** As noted by Appellant, he was acquitted of counts 18, 19, 20, 21, 22, 23, 24, 26, and 27. However, the fact that Appellant was acquitted of these offenses is irrelevant to whether he was sufficiently placed on notice of the predicate offenses within the indictment. To the extent that the prior state and federal convictions establishing his pattern of corrupt activity were insufficiently described, the indictment states: "and/or other drug offenses (Possession and/or Trafficking; State and/or Federal)." The bill of particulars, described the relevant time period as between 2010 and 2015 and includes drug possession and trafficking offenses, both state and federal. Importantly, Appellant

was convicted of his federal drug convictions, which served as a predicate offense, on March 6, 2015, and he was sentenced for those convictions on September 18, 2015. He was indicted on May 21, 2015 in the instant matter. Additionally, Appellant was held on the federal charges throughout the pretrial and trial stages of the case. (See 9/24/15 Hrg., p. 3; 6/20/16 Hrg., p. 4.) Appellant's knowledge of his federal conviction placed him on notice that the state would use the conviction as a predicate offense. Additionally, the federal charges arose during the time period described within the indictment and bill of particulars. Further, the state announced its intent to introduce evidence of the prior federal convictions related to the engaging in a pattern of corrupt activity charge in a pretrial hearing. (2/21/17 Hrg., p. 30.) Appellant did not object to the state's assertion at the hearing.

{¶44} Based on this record, Appellant has not demonstrated plain error as to the sufficiency of the indictment regarding the engaging in a pattern of corrupt activity charge. As such, his fourth assignment of error is without merit and is overruled.

## Conclusion

{¶45} Appellant argues that the trial court's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. Appellant also argues that the trial court erroneously admitted evidence of text messages in violation with the Confrontation Clause. Appellant additionally challenges the sufficiency of his indictment. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

Case No. 17 MA 0050

[Cite as *State v. Johnson*, 2019-Ohio-1089.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**